# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FILED COURT OF APPEALS DIV 1 STATE OF WASHINGTON 2018 FEB 12 AH 10:30

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 75903-5-I |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| KEVIN JORY BRAA, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: February 12, 2018 |
| | ) | |

DWYER, J. — Kevin Braa appeals from the superior court's order denying his postconviction motion to conduct a DNA (deoxyribonucleic acid) test of evidence in his case. Braa contends that the superior court erred by reasoning that such testing is not available in self-defense cases because a favorable test result would not identify a different person as the perpetrator of the crime. Braa also contends that the superior court erred by denying his motion on the ground that he did not show that a favorable DNA test result would, on a more probable than not basis, establish his innocence.

We conclude that the superior court erred by ruling that, in effect, postconviction DNA testing is not available in self-defense cases. However, we also conclude that the superior court did not err by ruling that a favorable DNA test result would not, on a more probable than not basis, establish Braa's innocence.

Accordingly, we affirm the superior court's decision to deny the requested testing.

I

The circumstances of Braa's crime of conviction are set forth in an unpublished opinion, State v. Braa, noted at 150 Wn. App. 1035, 2009 WL 1591369, as follows:

> On the evening of November 11, 2006, Kevin Braa was sitting at the bar reading a book in Kuhnle's Tavern in Marysville. Simeon Whitney was there playing pool with his brother, Roger Enick, and a friend, Kenny Celestine. Whitney, Enick, and Celestine are Native American and went to Kuhnle's Tavern because it is a hangout for Native Americans.
>
> Enick and another bar patron argued over a game of pool, and the other patron used racial slurs about Native Americans. At some point, Braa went over to the pool table and made offensive comments toward Enick. Whitney pushed Braa out of the way and told him, "Leave my homeboy alone." Braa told Whitney, "Go back to Mexico where you belong. You're a sub-human." When the bartender heard this, she told Braa that he would be asked to leave if he continued to talk that way. Braa did not comply, so she escorted him to the back door. A minute or two later, Whitney went out through the same door.
>
> A fight ensued between Whitney and Braa outside behind Kuhnle's Tavern. Witnesses saw Whitney repeatedly punch Braa and pull Braa's shirt up over his head. After the fight, Whitney started toward the back door of Kuhnle's, and Braa went over to his truck. Braa fired four to six shots at or toward the back door. Some witnesses saw Braa standing by his truck with the door open and his arm extended as he fired. Whitney staggered through the back door and collapsed by the bathrooms. When the bartender heard the gunshots and saw Whitney on the floor, she ducked down and called 911. Two witnesses saw Braa drive away in a white Chevy S-10 pickup.
>
> A police officer who happened to be a few blocks away heard the gunshots and responded to the scene. Whitney had a pulse but was bleeding from the abdominal area and was nonresponsive. He was airlifted to Harborview and died en route. Later, an autopsy determined Whitney had suffered four gunshot wounds. The wounds showed that the bullets traveled from back to front through Whitney's body. One bullet and fragments from another were recovered from his abdomen. Another bullet exited

through the front of his abdomen. The cause of Whitney's death was shock, trauma, and loss of blood due to the gunshot wounds.

Officers found bullet jacket fragments near where Whitney had lain. There were shell casings in the parking lot, as well as the book the defendant had been reading at the bar. Detectives recovered three bullets and bullet shrapnel from the back door area and the carpet just inside the back door. There were two indentations in the metal of the back door, which were consistent with bullet strikes. Detectives also located a bullet hole in an interior wall just inside the back door. Forensic analysis later confirmed that the bullet taken from Whitney's abdominal wall and the bullet found by the back door were fired from the same gun. The four shell casings found in the parking lot were compared and it was forensically determined that all had been fired from one gun.

Braa lived in a two-bedroom trailer that he shared with a roommate, Lenny Graff. Braa returned home around 10:30 on the night of the crime and asked Graff to get some beer, which Graff did. Graff recalled that Braa looked like he had been in a fight, with black eyes and a bloody nose. When Graff returned with the beer, Braa had changed his clothes and no longer looked dirty or bloody. Graff asked what had happened, and Braa told him that he had "killed a subhuman." When Graff asked what a subhuman was, Braa responded, "It means if you're not white, you're not right." He told Graff he had been jumped by some Mexicans who wanted to steal his wallet. He refused to discuss further the topic of killing someone and asked Graff to lie and say he had been home all night.

That night, Braa parked his car several feet further from the roadway than he usually did, and he did not move it for the next three days. On November 14, 2006, officers arrived at Braa's trailer to execute a search warrant and arrest him. They could see Braa inside, through the kitchen window. They announced their presence over the patrol car PA systems. They also used a "hailer," a box equipped with a loudspeaker, a handle for throwing, and hundreds of feet of cable, to communicate with Braa. Several times, an officer announced, "Kevin Braa, this is the Sheriff's Office. We have a warrant for your arrest. Identify yourself and surrender," but Braa did not come out. Officers shone lights into the home, and a helicopter was also used to illuminate the area. After Braa failed to respond to repeated voice commands, officers deployed two pepper spray projectile canisters through a window of the trailer. Braa came outside a few seconds later, complied with officers' verbal instructions, and was taken into custody.

Four and a half months later, while doing yard work, Graff discovered a plastic garbage bag under the deck of the trailer. Inside, he discovered Braa's 9mm semiautomatic Ruger handgun.

He called 911, and police picked up the gun. Forensic analysis confirmed that the bullet extracted from Whitney's abdominal wall had been fired from that weapon and that one of the four spent shell casings found in the parking lot had also been fired from that weapon. The other bullets and casings were not analyzed because it had already been determined that they had been fired from the same weapon as the tested bullet and casing. An expert in trajectory analysis testified that at least one bullet had been shot from a height of about four and a half feet, within 10 feet of where bullet fragments were imbedded in the wall inside the tavern. The evidence was consistent with the trajectory from a gun held by a person of average height while standing up.

At trial, Braa conceded that he shot the gun and argued that it had been in self-defense. He testified that he had a verbal exchange with some guys he thought were Mexican and that he had called them "Mexicans" and "sub-humans" and "invited them to go back to their own country." He recalled that the bartender had asked him to be quiet and go sit down, and he testified that he did so. Shortly afterward, he left the bar through the back door and as he was leaving was hit over the head and lost consciousness. When he came to, he was being beaten by an unknown assailant. He did not fight back but tried to protect himself by curling up. He tried to get away but was beaten more and shoved to the ground. He thought he was going to be beaten until he was killed. After being slammed into a vehicle, he got his gun out and fired immediately. He testified that he was slumped, lying on the ground when he fired.

Braa was charged with second degree murder and, in the alternative, first degree manslaughter. The jury found Braa guilty of the alternate charge of first degree manslaughter.

Braa, 2009 WL 1591369, at *1-3.

Nine years after his conviction, Braa filed a motion in the superior court seeking DNA testing of a drop of blood taken from the parking lot of the tavern on the night that Whitney was shot. Braa argued that the DNA test would reveal new information suggesting that Whitney had bled in the parking lot, thereby supporting Braa's trial defense that he had shot Whitney in self-defense while Whitney was standing in close proximity over him.

- 4 -

The superior court denied the motion on two separate grounds. The superior court first concluded that Braa failed to satisfy the DNA testing statute's requirement that the petitioner show that DNA testing is material to the identity of the perpetrator of the crime. This was so, the superior court concluded, because "the identity of the shooter (the defendant) is undisputed." The superior court also concluded that Braa's motion failed to establish that "favorable DNA evidence, when considered along with all of the other evidence, would not demonstrate his innocence on a more probable than not basis."

II

Braa contends that the superior court erred by denying his postconviction motion to conduct a DNA test of the blood drop.

We review the superior court's decision on such a motion for abuse of discretion. State v. Crumpton, 181 Wn.2d 252, 257, 332 P.3d 448 (2014) (citing State v. Riofta, 166 Wn.2d 358, 370, 209 P.3d 467 (2009)). The superior court "abuses its discretion if the decision rests on facts unsupported in the record or was reached by applying the wrong legal standard." Crumpton, 181 Wn.2d at 257 (citing State v. Rafay, 167 Wn.2d 644, 655, 222 P.3d 86 (2009)).

"RCW 10.73.170 provides a mechanism under Washington law for individuals to seek DNA testing in order to establish their innocence." Crumpton, 181 Wn.2d at 258. The statute provides:

> **DNA testing requests.** (1) A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.
>     (2) The motion shall:

(a) State that:

(i) The court ruled that DNA testing did not meet acceptable scientific standards; or

(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or

(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;

(b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and

(c) Comply with all other procedural requirements established by court rule.

(3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

RCW 10.73.170.

On appeal, Braa challenges the superior court's determinations that his motion did not satisfy subsections (2)(b) and (3) of RCW 10.73.170. We discuss each ruling in turn.

## A

Braa first contends that the superior court erred by denying his postconviction motion on the basis that his request did not demonstrate that the evidence he sought to test was material to the identity of the perpetrator of the crime. If the test result supports his defense of self-defense, Braa argues, then he can show that he acted lawfully—and was not the perpetrator of any crime. His contention has merit.

The procedural requirements set forth in RCW 10.73.170(2) are "lenient." Riofta, 166 Wn.2d at 367. As indicated, subsection (2)(b) requires that a motion

to conduct a DNA test of evidence "[e]xplain why DNA evidence is material to the identity of the perpetrator of . . . the crime." RCW 10.73.170(2)(b).

No prior appellate decision has discussed whether RCW 10.73.170(2)(b) is satisfied by a motion setting forth that DNA evidence supporting a claim of self-defense is material to the identity of the perpetrator of a crime. Thus, our inquiry begins with an examination of the statute itself. This requires that we apply familiar and recognized principles of statutory construction.

> The meaning of a statute is a question of law reviewed de novo. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The fundamental objective of the court is to carry out the legislature's intent and give effect to the statute's plain meaning. Id. "'[T]he plain meaning rule requires courts to consider legislative purposes or policies appearing on the face of the statute [as well as] background facts of which judicial notice can be taken.'" Id. at 11 (quoting 2A Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION § 48A:16, at 809-10 (6th ed. 2000)).

Riofta, 166 Wn.2d at 365.

"Perpetrator" is not defined in chapter 10.73 RCW. When the legislature has not defined a term, we look to dictionary definitions to determine the term's plain meaning. Buchheit v. Geiger, 192 Wn. App. 691, 696, 368 P.3d 509 (2016). A well-recognized dictionary defines "perpetrator" as "one that perpetrates esp. an offense or crime." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1684 (2002). Further, "perpetrate" is defined as "to be guilty of (as a crime, an offense)." WEBSTER'S, supra, at 1684. Hence, a person who commits a crime is a perpetrator. Logically, a person who does not commit a crime is not a perpetrator. This understanding aligns with the goal of the DNA testing statute—to make DNA testing available "as a way to ensure an innocent person is not in jail." Crumpton, 181 Wn.2d at 258.

-7-

Braa's trial defense was not that someone else committed the crime at issue. Instead, his defense was that *no* crime was committed because he acted in lawful self-defense. In this way, he attempted to show that he was not a perpetrator.

A person who kills in lawful self-defense is not a perpetrator because justifiable homicide is not a crime. RCW 9A.16.050.[1] Therefore, if a person convicted of manslaughter was actually engaging in lawful self-defense while causing the death, that person was misidentified as the perpetrator of the manslaughter crime. Indeed, a valid self-defense claim establishes that there was no perpetrator.

Accordingly, when DNA evidence supports the assertion that the jury's verdict wrongfully identified the petitioner as the perpetrator of a crime even though the petitioner had, in actuality, acted in lawful self-defense, such evidence is material to the "identity of the perpetrator" within the meaning of RCW 10.73.170(2)(b).

The State nevertheless contends that the superior court did not err in denying Braa's motion for failing to satisfy subsection (2)(b). This is so, the State

---

[1] RCW 9A.16.050 reads:
**Homicide—By other person—When justifiable.** Homicide is also justifiable when committed either:
    (1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother, or sister, or of any other person in his or her presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; or
    (2) In the actual resistance of an attempt to commit a felony upon the slayer, in his or her presence, or upon or in a dwelling, or other place of abode, in which he or she is.

- 8 -

asserts, because Braa's identity as the shooter was undisputed at trial and, therefore, the evidence sought to be tested cannot be material to the identity of the perpetrator in Braa's case.

The State's argument misreads subsection (2)(b) by confusing "shooter" with "perpetrator." Subsection (2)(b) does not require a showing that the evidence is material to the identity of the *shooter* but, rather, it requires materiality to the "identity of the *perpetrator.*" RCW 10.73.170(2)(b) (emphasis added). "Shooter" and "perpetrator" are not synonymous.

The State's argument suffers from yet another failing. The State argues that postconviction DNA testing is not available in self-defense claims, even if the test result might establish the innocence of the petitioner. But the State cannot explain why the legislature would have enacted a statute designed to free some—but not all—innocent persons. We see no suggestion in RCW 10.73.170 of such a perverse legislative intent.

The superior court erred by denying Braa's motion on the ground that it did not satisfy RCW 10.73.170(2)(b).

B

Braa next contends that the superior court erred by denying his motion to conduct a DNA test of the blood spot on the basis that he did not demonstrate that a favorable DNA test result would establish his innocence on a more probable than not basis. We disagree.

The substantive requirement of RCW 10.73.170(3) is "'onerous.'" Crumpton, 181 Wn.2d at 261 (quoting Riofta, 166 Wn.2d at 367).

- 9 -

> The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

RCW 10.73.170(3).

In determining whether a petitioner has satisfied this requirement, our Supreme Court has instructed that the petitioner is entitled to the "favorable presumption" of an "exculpatory DNA test result." Crumpton, 181 Wn.2d at 260. But in considering the petitioner's motion pursuant to subsection (3), the superior court

> should not ignore the evidence from trial. It must look at DNA evidence in the context of all the evidence against the individual when deciding the motion. Riofta, 166 Wn.2d at 368. It is only within the context of the other evidence that the court can determine whether DNA evidence might demonstrate innocence.

Crumpton, 181 Wn.2d at 262 (footnote omitted).

Accordingly, we "look to whether, considering all the evidence from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis." Crumpton, 181 Wn.2d at 260.

Assuming a favorable DNA test result and considering all of the evidence presented at trial, the record supports the superior court's conclusion that Braa did not establish his innocence on a more probable than not basis.

A DNA test of the drop of blood found in the parking lot of the tavern would determine that the blood came from one of three potential sources: Braa,

Whitney, or a third party. A favorable DNA test result would be that the DNA was Whitney's.[2]

Braa contends that, in addition to a favorable inference as to the DNA test result, he is further entitled to a favorable inference as to how Whitney's drop of blood came to be located in the parking lot.

However, Braa establishes no basis for such an inference. The statutory scheme places the burden of demonstrating the entitlement to a DNA test on the petitioner. RCW 10.73.170(2), (3). As an initial matter, Braa presents no argument or authority in support of his interpretation of RCW 10.73.170. Furthermore, neither our Supreme Court nor this court has held that a petitioner is entitled to additional inferences in his favor beyond the assumption of a favorable DNA test result. See, e.g., State v. Thompson, 173 Wn.2d 865, 875, 271 P.3d 204 (2012) (discussing whether DNA test results would exclude petitioner's DNA); Riofta, 166 Wn.2d at 370 (discussing that DNA test of white hat could result in two favorable test results for petitioner); State v. Gray, 151 Wn. App. 762, 774, 215 P.3d 961 (2009) (discussing possible favorable DNA test results). Nothing in the statutory scheme authorizes an inference in Braa's favor to be drawn from the inference of a favorable test result.

Braa wants it to be that the existence of a drop of Whitney's blood in the parking lot necessarily means that he suffered a gunshot at that spot. However, even if the drop of blood was Whitney's, this does not necessarily follow. That a

---

[2] If the DNA belonged to Braa, it would not be favorable to him because it would prove nothing about Whitney's location when he was shot. Similarly, if the DNA belonged to a third party, it would not support Braa's self-defense claim. If the DNA belonged to Whitney, however, it could support Braa's self-defense theory by placing Whitney's blood in the parking lot.

drop of Whitney's blood came from a gunshot wound he incurred while standing near Braa is not the only possible conclusion available. Indeed, there are three possibilities as to how a drop of Whitney's blood might have been deposited in the parking lot: from the fistfight between Whitney and Braa, from Whitney's gunshot wound, or from a third party unintentionally tracking Whitney's blood from one location—e.g., near the rear door of the tavern—into the parking lot.

At trial, Braa testified that, after he had been "lifted up and slammed" into a vehicle and was lying on the ground in fear for his life, he drew his gun, aimed upwards, and fired in the direction of the person standing in close proximity over him. This person was Whitney.

But even assuming that the drop of blood found in the parking lot was Whitney's, the evidence introduced at trial strongly contradicts Braa's self-defense theory. The evidence established that Whitney had been shot in the back at least three times. It further established that the bartender heard a burst of gunshots contemporaneously with Whitney crashing through the rear door of the tavern, 30 feet away from where Braa was seen to have fired the gunshots. In addition, the evidence established that there was a great deal of blood in the area of the rear door of the tavern.

Moreover, three witnesses testified that they saw Braa firing a burst of gunshots in the direction of the rear door of the tavern while he was alone in the parking lot. One of the three eyewitnesses also testified that he saw Braa alone in the parking lot both *before* and *after* the shots were fired. Two of the

eyewitnesses also testified that they saw Braa fire his gun while standing up, rather than while lying on the ground.

Bullet trajectory analysis testified to at trial further supported that the gunshots were fired from a standing position. Additional analysis of the indentations in the walls of the tavern and bullet fragments found in and near the rear door of the tavern established that multiple gunshots had been fired in that direction.

In addition, other testimony showed that Braa hid the gun in question under his porch. This supported the State's theory that Braa had a guilty conscience arising from his slaying of Whitney. Such a guilty conscience is incompatible with Braa believing that he had acted in lawful self-defense by shooting Whitney. Braa also admitted that, before he went to the tavern's parking lot, he had been angry because a "subhuman" had pushed him and wounded his pride.

On a more probable than not basis, a favorable DNA test result (that a drop of Whitney's blood was located in the parking lot) when considered alongside the evidence adduced at trial would not demonstrate that Braa is likely innocent. Accordingly, the superior court did not abuse its discretion by denying his request for DNA testing.[3]

---

[3] Braa filed a pro se statement of additional grounds for review. It raises no issue meriting analysis.

No. 75903-5-I/14

Affirmed.

We concur:

_Dwyer, J._

_Schindler, J._                    _Becker, J._