IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 80614-9-I |
| Respondent, | |
| v. | DIVISION ONE |
| KEVIN J. BRAA, | UNPUBLISHED OPINION |
| Appellant. | |

CHUN, J. — Kevin Braa shot Simeon Whitney in a bar fight.  Whitney died as a result.  A jury found Braa guilty of first degree manslaughter with a firearm and five counts of unlawful possession of a firearm.  Following his conviction, Braa moved multiple times for post-conviction DNA testing of evidence from the crime scene to establish a self-defense claim.  We previously considered two appeals of denials of those motions in State v. Braa, 2 Wn. App. 2d 510, 410 P.3d 1176 (2018) (Braa II), and State v. Braa, No. 77446-8-I (Wash. Ct. App. Jul. 22, 2019) (unpublished) http://www.courts.wa.gov/opinions/pdf/774468.pdf (Braa III), and affirmed the trial court in both cases.  Braa now appeals the trial court's denial of a third motion for post-conviction DNA testing.  We affirm.

I. BACKGROUND

We summarized the facts in an opinion deciding a direct appeal of his conviction:

> On the evening of November 11, 2006, Kevin Braa was sitting at the bar reading a book in Kuhnle's Tavern in Marysville.  Simeon

Citations and pin cites are based on the Westlaw online version of the cited material.

Whitney was there playing pool with his brother, Roger Enick, and a friend, Kenny Celestine. Whitney, Enick, and Celestine are Native American and went to Kuhnle's Tavern because it is a hangout for Native Americans.

Enick and another bar patron argued over a game of pool, and the other patron used racial slurs about Native Americans. At some point, Braa went over to the pool table and made offensive comments toward Enick. Whitney pushed Braa out of the way and told him, "Leave my homeboy alone." Braa told Whitney, "Go back to Mexico where you belong. You're a sub-human." When the bartender heard this, she told Braa that he would be asked to leave if he continued to talk that way. Braa did not comply, so she escorted him to the back door. A minute or two later, Whitney went out through the same door.

A fight ensued between Whitney and Braa outside behind Kuhnle's Tavern. Witnesses saw Whitney repeatedly punch Braa and pull Braa's shirt up over his head. After the fight, Whitney started toward the back door of Kuhnle's, and Braa went over to his truck. Braa fired four to six shots at or toward the back door. Some witnesses saw Braa standing by his truck with the door open and his arm extended as he fired. Whitney staggered through the back door and collapsed by the bathrooms. When the bartender heard the gunshots and saw Whitney on the floor, she ducked down and called 911. Two witnesses saw Braa drive away in a white Chevy S-10 pickup.

A police officer who happened to be a few blocks away heard the gunshots and responded to the scene. Whitney had a pulse but was bleeding from the abdominal area and was nonresponsive. He was airlifted to Harborview and died en route. Later, an autopsy determined Whitney had suffered four gunshot wounds. The wounds showed that the bullets traveled from back to front through Whitney's body. One bullet and fragments from another were recovered from his abdomen. Another bullet exited through the front of his abdomen. The cause of Whitney's death was shock, trauma, and loss of blood due to the gunshot wounds.

Officers found bullet jacket fragments near where Whitney had lain. There were shell casings in the parking lot, as well as the book the defendant had been reading at the bar. Detectives recovered three bullets and bullet shrapnel from the back door area and the carpet just inside the back door. There were two indentations in the metal of the back door, which were consistent with bullet strikes. Detectives also located a bullet hole in an interior wall just inside the back door. Forensic analysis later confirmed that the bullet taken from Whitney's abdominal wall and the bullet found by the back door

were fired from the same gun. The four shell casings found in the parking lot were compared and it was forensically determined that all had been fired from one gun.

Braa lived in a two-bedroom trailer that he shared with a roommate, Lenny Graff. Braa returned home around 10:30 on the night of the crime and asked Graff to get some beer, which Graff did. Graff recalled that Braa looked like he had been in a fight, with black eyes and a bloody nose. When Graff returned with the beer, Braa had changed his clothes and no longer looked dirty or bloody. Graff asked what had happened, and Braa told him that he had "killed a subhuman." When Graff asked what a subhuman was, Braa responded, "It means if you're not white, you're not right." He told Graff he had been jumped by some Mexicans who wanted to steal his wallet. He refused to discuss further the topic of killing someone and asked Graff to lie and say he had been home all night.

That night, Braa parked his car several feet further from the roadway than he usually did, and he did not move it for the next three days. On November 14, 2006, officers arrived at Braa's trailer to execute a search warrant and arrest him. They could see Braa inside, through the kitchen window. They announced their presence over the patrol car PA systems. They also used a "hailer," a box equipped with a loudspeaker, a handle for throwing, and hundreds of feet of cable, to communicate with Braa. Several times, an officer announced, "Kevin Braa, this is the Sheriff's Office. We have a warrant for your arrest. Identify yourself and surrender," but Braa did not come out. Officers shone lights into the home, and a helicopter was also used to illuminate the area. After Braa failed to respond to repeated voice commands, officers deployed two pepper spray projectile canisters through a window of the trailer. Braa came outside a few seconds later, complied with officers' verbal instructions, and was taken into custody.

Four and a half months later, while doing yard work, Graff discovered a plastic garbage bag under the deck of the trailer. Inside, he discovered Braa's 9mm semiautomatic Ruger handgun. He called 911, and police picked up the gun. Forensic analysis confirmed that the bullet extracted from Whitney's abdominal wall had been fired from that weapon and that one of the four spent shell casings found in the parking lot had also been fired from that weapon. The other bullets and casings were not analyzed because it had already been determined that they had been fired from the same weapon as the tested bullet and casing. An expert in trajectory analysis testified that at least one bullet had been shot from a height of about four and a half feet, within 10 feet of where bullet fragments were imbedded in

3

the wall inside the tavern. The evidence was consistent with the trajectory from a gun held by a person of average height while standing up.

At trial, Braa conceded that he shot the gun and argued that it had been in self-defense. He testified that he had a verbal exchange with some guys he thought were Mexican and that he had called them "Mexicans" and "sub-humans" and "invited them to go back to their own country." He recalled that the bartender had asked him to be quiet and go sit down, and he testified that he did so. Shortly afterward, he left the bar through the back door and as he was leaving was hit over the head and lost consciousness. When he came to, he was being beaten by an unknown assailant. He did not fight back but tried to protect himself by curling up. He tried to get away but was beaten more and shoved to the ground. He thought he was going to be beaten until he was killed. After being slammed into a vehicle, he got his gun out and fired immediately. He testified that he was slumped, lying on the ground when he fired.

Braa was charged with second degree murder and, in the alternative, first degree manslaughter. The jury found Braa guilty of the alternate charge of first degree manslaughter.

State v. Braa, noted at 150 Wn. App. 1035, 2009 WL 1591369, at *1–3 (Braa I).

In 2016, Braa moved the court under RCW 10.73.170,[1] seeking appointment of counsel and DNA testing of a blood drop in the parking lot

---

[1] RCW 10.73.170 provides, in applicable part:

(1) A person convicted of a felony in Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.

(2) The motion shall:

(a) State that:

(i) The court ruled that DNA testing did not meet acceptable scientific standards; or

(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or

(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;

(evidence items 1 and 5). Braa III, No. 77446-8, slip op. at 5. The trial court denied Braa's motion, and in a published opinion, Braa II, this court affirmed, concluding

> that a favorable DNA test result of the blood drop would not establish Braa's innocence on a more probable than not basis. State v. Braa, 2 Wn. App. 2d 510, 523, 410 P.3d 1176 (2018). It reasoned that even if Braa were entitled to a "favorable presumption" that a DNA test would reveal the blood belonged to Whitney, Braa was not entitled to the presumption that the existence of Whitney's blood in that specific location in the parking lot meant Braa shot Whitney in that location. Id. at 521. It noted that Whitney's blood could have ended up in that spot in a number of ways, including during the fist fight itself; it did not mean that Braa shot Whitney in that location. Id. at 522. Thus it concluded that the trial court had not abused its discretion when it denied Braa's motion.

Braa III, No. 77446-8, slip op. at 5–6.

In 2017, Braa moved a second time, seeking DNA testing of bullet jackets or fragments from the parking lot (evidence items 10 and 18). Braa III, No. 77446-8, slip op. at 6. "Braa claimed that DNA testing of these bullet jackets or fragments 'would provide new information about where [Whitney] actually was when shot, confirming Braa's claim of necessity due to self defense/imminent danger.'" Id. (alteration in original). The trial court denied the motion because Braa had not met his substantive burden of demonstrating that any favorable

---

(b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and

(c) Comply with all other procedural requirements established by court rule.

(3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

DNA evidence would show his innocence on a more probable than not basis. Id. And this court affirmed. Id. at 10. The reviewing panel recognized that even if the bullet jacket near Braa's shooting position tested positive for Whitney's DNA, it would not establish that he acted in self-defense, since the position of the bullet shrapnel does not necessarily show that Whitney was shot in same location as the shrapnel. Id. at 8. It also reasoned that if the bullet shrapnel near the back door tested positive for Whitney's DNA, "this evidence would place Whitney exactly where witnesses observed him when Braa shot him." Id. Finally, it noted that Braa's actions following the shooting, such as hiding the gun, admitting he had "killed a sub-human," and telling his roommate to lie to police about his whereabouts, did not support his self-defense claim. Id. at 10.

In 2019, Braa moved a third time for post-conviction DNA testing. Braa's motion seeks testing of:

- The blood spot and bullet jackets or fragments identified in his previous two motions (evidence items 1, 5, 10, and 18); and
- Blood from the bar's back doorjamb (evidence items 2 and 3);
- A copper bullet from the parking lot (evidence item 13);
- A lead bullet from the parking lot near the back door (evidence item 16);
- A lead bullet in the bar hallway that went through the wall (evidence item 21); and
- Whitney's fingernail clippings taken at autopsy (evidence items 80 and 85).

Braa requested that the deciding court examine the newly requested evidence cumulatively with the evidence from the previous motions: "[a]ny item examined in solitary isolation previously becomes a completely new issue and

grounds/argument when combined collectively with the numerous other items." The trial court again denied his motion because he had not met his substantive burden under RCW 10.73.170(3), stating that "even assuming DNA testing of the requested evidence was favorable, such favorable result when considered along with all the other evidence from the trial would NOT demonstrate his innocence on a more probable than not basis." Braa appeals.

## II. ANALYSIS

Braa says the trial court abused its discretion in denying his motion for post-conviction DNA testing since a favorable testing result for the requested items would render it more probable than not that he shot Whitney in self-defense. We disagree.

We review for abuse of discretion a trial court's decision on a motion for post-conviction DNA testing. State v. Crumpton, 181 Wn.2d 252, 257, 332 P.3d 448 (2014). "A court abuses its discretion when an 'order is manifestly unreasonable or based on untenable grounds.'" State v. Rafay, 167 Wn.2d 644, 655, 222 P.3d 86 (2009) (quoting Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)). For example, a court "abuses its discretion if the decision rests on facts unsupported in the record or was reached by applying the wrong legal standard." Crumpton, 181 Wn.2d at 257.

In deciding a motion for post-conviction DNA testing under RCW 10.73.170, "[a] court should look to whether, considering all the evidence

from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis," and if so, grant the motion. Id. at 260–61; RCW 10.73.170(3). But the court must look at the potentially exculpatory DNA evidence in the context of all the other evidence at trial when deciding whether the DNA evidence might show innocence. Id. at 262–63. The substantive hurdle imposed by RCW 10.73.170(3) is meant to be onerous, and "[t]esting should be limited to situations where there is a credible showing that it could benefit a possibly innocent individual." Id. at 261. And while a petitioner is entitled to an inference of a favorable DNA result, they are not entitled to additional favorable presumptions. See Braa II, 2 Wn. App. 2d. at 521–22 (while Braa was entitled to inference that the blood drop contained Whitney's DNA, Braa was not entitled to inference that blood proved Whitney was shot in that spot).

A claim of self-defense can support a motion for post-conviction DNA testing. Id. at 520.[2] A person may justifiably commit homicide "when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great person injury to the slayer . . . and there is imminent danger of such design being accomplished." RCW 9A.16.050(1).

---

[2] The trial court denied Braa's motion for post-conviction DNA testing because he did not meet his substantive burden under RCW 10.73.170(3). The trial court did not rule that Braa failed to meet his procedural burden under RCW 10.73.170. Braa says that he met his procedural burden under the statute; the State agrees. And in deciding Braa's first motion for post-conviction DNA testing, we decided that Braa met his procedural burden under the statute and that a motion for post-conviction DNA testing can rest on a self-defense claim. Braa II, 2 Wn. App. 2d at 520. We assume that Braa met his procedural burden under the statute.

"A person who kills in lawful self-defense is not a perpetrator because justifiable homicide is not a crime." Braa II, 2 Wn. App. 2d at 519.

Braa contends that a favorable outcome of testing the copper bullet in the parking lot (item 13) would be that it contains Whitney's DNA; since the copper bullet was near Braa's position, he says that the presence of Whitney's DNA would support his theory that he shot Whitney in self-defense. This theory aligns with his argument regarding testing of the blood drop in the parking lot (items 1 and 5) and the testing of the copper shrapnel (items 10 and 18) from his earlier motions—there, as here, he said that Whitney's DNA on items close to him would establish that he shot Whitney in close range and thus in self-defense. By contrast, Braa says that a favorable outcome of testing the doorjamb blood (items 2 and 3), the lead bullet near the back door (item 16), and the lead bullet in the bar hallway (item 21) would be that they lack Whitney's DNA; since these items were not close to Braa, he says the lack of DNA would support his assertion that he did not shoot Whitney while Whitney was far from him.

But as addressed in this court's previous decisions on Braa's motions for DNA testing, while he is entitled to an inference of favorable DNA testing, he is not entitled to an inference that the presence of Whitney's DNA in a given location establishes that Whitney was shot in that location; the presence of Whitney's DNA on an item in a particular location does not necessarily show that Whitney was shot in that item's position. See Id. at 521–22. And as discussed

9

below, testing of the requested items would not make it more probable than not that Braa acted in self-defense.

*Items 2 and 3*

As to the blood on the doorjamb, Braa's claim that a lack of Whitney's DNA in the blood would help establish his self-defense claim is unavailing. The presence of another unidentified person's blood on the door frame has nothing to do with Whitney's proximity to Braa when he was shot.[3]

*Items 16 and 21*

As to the bullet near the back door and the bullet inside the bar hallway, it is hard to see how their lack of Whitney's DNA would show that Braa shot Whitney while Whitney was close to Braa. The lack of DNA would show that Braa missed while firing at Whitney, regardless of proximity. Indeed, common sense dictates that Braa would be more likely to miss Whitney if Whitney were far away when he fired. A lack of Whitney's DNA on the bullet fragment at the back door and inside the bar hallway would not support Braa's self-defense claim.

---

[3] In his SAG, Braa says that, in the alternative, if it does contain Whitney's DNA, the blood is a smear, not a spray, so there would have to be "bleed time" to get through Whitney's clothing, showing that he did not shoot Whitney while Whitney was near the door. Braa's claim about "bleed time" requires another inference about the permeability of Whitney's clothing to which he is not entitled. Braa II, 2 Wn. App. 2d at 521–22. This assertion also ignores the large amount of other evidence suggesting Braa's guilt, as addressed below. And Braa makes no meaningful citation to the record supporting his characterization of the blood spot as a "smear" rather than a spray. The presence of Whitney's DNA on the doorjamb does not bolster Braa's self-defense claim.

*Item 13*

As to the copper bullet in the parking lot near Braa's position, even if it contained Whitney's DNA, it would not necessarily show that Braa shot Whitney in that location. A forensic scientist testified that it would be difficult to tell where a shooter fired their weapon based on the location of shrapnel. And it was windy the night of the shooting and the bar patrons had walked through the crime scene; also some evidence placards had no evidence next to them. Finally, this court considered and rejected a similar argument about another bullet fragment in the parking lot—item 10—in Braa's previous appeal. Braa III, No. 77446-8-I, slip op. at 8–9. Even assuming favorable testing of this item, it would not establish that Braa more probably than not acted in self-defense.[4]

*Other Evidence*

As this court pointed out in Braa's direct appeal and his previous two appeals, the other evidence from trial strongly cuts against Braa's self-defense claim. For instance, Braa shot Whitney from behind at least three times. Braa II, 2 Wn. App. 2d at 522. The bartender saw the back bar door open, heard three shots, then saw Whitney walking through; that Whitney could open the door before Braa fired the shots shows that Whitney was no longer near Braa when he fired. Multiple eyewitnesses to the shooting saw Braa either with his arm up or

---

[4] In his SAG, Braa says testing of Whitney's fingernail clippings (items 80 and 85) will show wounds to Braa's face, neck, and body were caused by Whitney's attack and not by Braa's arrest. Thus, he says, they will show that he more probably than not acted in self-defense. But Whitney and Braa fought. And it is unclear, from Braa's SAG, why testing of the fingernail clippings would show that Whitney's attack on Braa was so violent that he needed to respond to it with deadly force.

firing toward the bar's back door, and did not see Whitney or any other person near him. Braa hid his gun after the shooting. When he arrived at home, Braa told his roommate that he had "killed a sub-human" and asked the roommate to lie to police as to his whereabouts that evening. This evidence strongly undercuts Braa's assertion that he shot Whitney in self-defense.

*Previous Requests*

Finally, Braa recognizes that he previously requested testing for some of the items identified in the motion here in his previous motions for testing: a blood spot and bullet jackets or fragments from the parking lot (evidence items 1, 5, 10, and 18). As addressed above, this court affirmed dismissals of testing of those items in Braa II and Braa III. But Braa says the trial court still abused its discretion in dismissing this motion because it did not consider the cumulative impact of testing those previously identified items with the newly identified items in this motion.

Braa cites no law for the proposition that the trial court must consider all the requested evidence cumulatively and we need not consider an argument unsupported by legal authority. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (arguments not supported by legal authority need not be considered). Even if it needed to consider the evidence cumulatively, nothing in the court's decision shows that it failed to do so. And neither we nor the trial court must reweigh whether to grant Braa's motion for testing as to the evidence identified in his previous two motions, since those

motions were denied on their merits. See In re Pers. Restraint of Haverty, 101 Wn.2d 498, 503, 681 P.2d 835 (1984) (holding that a court will not consider a collateral attack to a conviction if it (1) presents the same grounds as those from a previous collateral attack, and the prior court determined those issues adversely to the petitioner, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the later application).[5]

And the trial court would not have abused its discretion in denying Braa's petition if considered the evidence cumulatively. As repeatedly addressed above, the presence of Whitney's DNA in a given location does not establish that he was shot in that same location, and the other evidence from trial strongly cuts against his self-defense claim.

SAG

Braa says in his SAG that we should order testing because of prosecutorial misconduct at trial, because his trial counsel and the trial court constructively denied his right to counsel, and because of cumulative error at trial. He cites no law establishing that these issues can serve as grounds for a court to grant a motion for testing. We need not consider arguments unsupported by legal authority. See Cowiche Canyon, 118 Wn.2d at 809 (arguments not supported by legal authority need not be considered). And it

---

[5] Braa says we should grant him leniency on this issue because he filed those motions self-represented, but Washington courts hold a self-represented litigant to the same standards to which they hold attorneys. Edwards v. Le Duc, 157 Wn. App. 455, 460, 238 P.3d 1187 (2010).

appears none exist, since as addressed above, RCW 10.73.170 allows a court to order testing only when considering all the evidence from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis.  We reject these claims.

Affirmed.

_Chun, J._

WE CONCUR:

_Appelwick, J._

14