**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83909-8-I |
| Respondent, | |
| v. | DIVISION ONE |
| MARTEZ WINTERS, | UNPUBLISHED OPINION |
| Appellant. | |

BIRK, J. — Martez Winters appeals a superior court order denying his postconviction motion for deoxyribonucleic acid (DNA) testing based on a claim of innocence on a more probable than not basis under RCW 10.73.170. We affirm.

I

The circumstances that led to Winters's convictions are set forth in an unpublished opinion[1] as follows:

> On June 28, 2008, police were dispatched to Cedar Village, a Seattle apartment complex, to investigate "a crime of violence where a firearm had been involved." Theresa Croone, who lived in Cedar Village, observed a woman trying to buy crack cocaine from a woman named Mimi just before the police arrived. Once the police arrived, Mimi hid a rock of crack cocaine under some landscaping bark in front of Croone's apartment before entering another apartment.
> The police suspected that Martez Winters was involved in the crime that they were investigating. In an effort to hide from police, Winters sought refuge in Croone's apartment. Croone saw Winters enter her apartment uninvited and followed him inside. After entering the apartment, she saw Winters holding a black gun. Croone told

---

[1] Generally, unpublished opinions may be cited for evidence of facts established in earlier proceedings in the same case involving the same parties. State v. Seek, 109 Wn. App. 876, 878 n.1, 37 P.3d 339 (2002).

Winters to leave her apartment. Winters refused. Winters "said he had to get away from the police . . . and that he would shoot the police before he would go back . . . to jail."

While in Croone's apartment, Winters frequently spoke on his cellular telephone in an effort to determine where the police were located. Croone testified that Winters "had his gun drawn the whole time." She also testified that, at one point, Winters "grabbed the back of [her] arm and basically used [her] as a human shield with his gun pointed in [her] back, and proceeded to walk out with [her]." Eventually, after again using Croone as a human shield in order to leave Croone's apartment, Winters jumped through an open window into the apartment in which Mimi was located.

Later that same day, Winters returned to Croone's apartment with Mimi after discovering that the rock of crack cocaine that Mimi had hidden under the bark was missing. Winters claimed that the rock of crack cocaine belonged to him. Winters believed that Croone had taken the drugs. She denied having done so but Winters did not believe her. Winters threatened to kill Croone if she did not give him either the drugs or money for the drugs. The next day, Winters returned to Croone's apartment and asked Croone for the drugs. When Croone again denied having the drugs, Winters pulled out a silver gun. He told Croone that she was going to die if he did not get his money. Shortly after this incident, Croone called 911.

A few days later, on July 3, Winters returned to Croone's apartment, pointed a silver gun at her head, and stated, "you are going to give me my money, or you are going to die. And I'm not going to tell you again." Once Winters departed, Croone telephoned the police to give them a description and a partial license plate number of the SUV in which Winters was riding. Shortly thereafter, police officers spotted the vehicle and conducted a felony traffic stop.

The driver immediately exited the vehicle. Winters was seated in the front passenger seat of the SUV and, although ordered "to open the door and show his hands," did not comply. After an officer repeated the order, Winters opened the door. Winters was then ordered to show both of his hands but, instead, extended only one hand out of the door. Winters eventually exited the vehicle and was handcuffed. Two guns were found under the driver's seat of the SUV. One of the guns recovered from the vehicle was a black gun and the other was a "stainless-steel-colored handgun."

Based upon the preceding incidents, Winters was charged with burglary in the first degree, kidnapping in the first degree, felony harassment, assault in the second degree, and two counts of unlawful possession of a firearm in the first degree.

. . . .

A jury found Winters guilty on all counts.

State v. Winters, noted at 158 Wn. App. 1053, 2010 WL 5060198, at *1-2 (citations omitted) (alterations in original).  We affirmed his convictions and sentence.  Id. at *7.

On January 27, 2022, Winters filed a motion for postconviction DNA testing under RCW 10.73.170.  Winters attached as an exhibit an e-mail dated March 5, 2009 from a prosecutor that reads as follows:

> Report is on its way to you - not very helpful and the reasons we don't often do gun DNA.
>
> On Glock - mixture of at least 4 individuals - no conclusion about inclusion or exclusion of Winters can be made.
>
> On Ruger - mixture of at least 3 individuals - Winters included as a possible contributor - however 1 in 2 individuals is a possible contributor.

Winters argued new DNA testing would be "material to the identity of the perpetrator" and "can play a significant role to [Winters's] defense."

The superior court denied Winters's motion.  The court found Winters failed to provide a basis to order DNA testing, did not establish how retesting evidence previously tested would or could exculpate him, and failed to establish any facts demonstrating that DNA testing would establish his innocence on a more probable than not basis.  The court denied Winters's subsequent motion for reconsideration.  Winters appeals.

II

We review a trial court's denial of a motion for a postconviction DNA test for an abuse of discretion.  In re Pers. Restraint of Pheth, 20 Wn. App. 2d 326, 341-42, 502 P.3d 920 (2021).  A court abuses its discretion if its decision is based on

3

untenable grounds or untenable reasons. Id. at 342. We will not reverse the trial court's decision unless we believe that no reasonable judge would have made the same ruling. State v. Burke, 196 Wn.2d 712, 741, 478 P.3d 1096, cert. denied, 142 S. Ct. 182 (2021).

A court must grant a motion for new DNA testing if the convicted person shows "the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3). Washington decisions have explained this requires more than a showing that new DNA testing would merely raise some doubt about the defendant's guilt, but rather requires a showing that new DNA testing would show innocence on a more probable than not basis. State v. Crumpton, 181 Wn.2d 252, 260, 332 P.3d 448 (2014); State v. Braa, 2 Wn. App. 2d 510, 521, 410 P.3d 1176 (2018). Courts must "focus on the likelihood that DNA evidence could demonstrate the individual's innocence in spite of the multitude of other evidence against them." Crumpton, 181 Wn.2d at 262. However, "a trial court should not ignore the evidence from trial" but "must look at DNA evidence in the context of all the evidence against the individual when deciding the motion." Id. Petitioners are not entitled to additional, favorable inferences beyond the assumption of a favorable DNA test result. Braa, 2 Wn. App. 2d at 521.

Winters argues that if his DNA were excluded from the recovered firearms, that would create an inference that Winters did not handle the firearms and did not commit the crimes of unlawful possession of a firearm. Winters contends this inference would also weaken his connection to his other convictions and suggests

Croone's identification of Winters as the person inside her apartment was a case of mistaken identity. We disagree.

A favorable DNA test would suggest only that Winters did not actually possess the two guns at the time of their seizure, not that Winters could not have constructively possessed them. In our opinion for his direct appeal, we held the record contained "sufficient evidence to prove that Winters had 'dominion and control' over the firearms and, thus, had constructive possession of both guns." Winters, 2010 WL 5060198, at *5. Winters did not have to leave his DNA on the guns to constructively possess them. A favorable test excluding Winters's DNA from the firearms at the time of their recovery would not establish his innocence of constructively possessing them on a more probable than not basis. And a favorable test would not undermine Croone's testimony that Winters actually possessed two different firearms while occupying her apartment.

Even assuming testing revealed the absence of Winters's DNA on the guns, the evidence at trial strongly contradicts Winters's mistaken identity theory. Winters returned to Croone's home to confront her over the course of several days and brandished two guns. Id. at *1-2. Following the last confrontation, Croone contacted law enforcement and provided a partial license plate description of the vehicle Winters was riding in, which led the police to initiate a felony traffic stop in which they located Winters. Id. at *2. The driver exited immediately, while Winters complied with commands to show his hands and exit the vehicle "eventually." Id. The two guns found under the vehicle's driver's seat matched Croone's descriptions of the guns brandished against her. Id. at *1-2.

A favorable DNA test result (that Winters's DNA was not found on the seized guns) when considered alongside the evidence adduced at trial would not demonstrate that Winters is innocent on a more probable than not basis. Accordingly, the superior court did not abuse its discretion by denying Winters's motion for DNA testing.

Affirmed.

_Birk, J._

WE CONCUR:

_Chung, J._          _Mann, J._